WILLIAM E. DWYER and CECILIA DWYER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dwyer v. Commissioner
Docket No. 1793-69.
United States Tax Court
T.C. Memo 1973-61; 1973 Tax Ct. Memo LEXIS 225; 32 T.C.M. (CCH) 266; T.C.M. (RIA) 73061; March 19, 1973, Filed *225 Frank R. Saletri, for the petitioners. Richard W. Janes, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPIONION
The Commissioner determined the following deficiencies in petitioners' income tax: Year
Deficiency
1963
$2,153.18
1964
6,539.00
1965
901.00
1966
270.00
The only issue remaining for decision is whether petitioner William E. Dwyer, an insurance claims adjuster, directed renovation business to a certain contracting firm in return 2 for a percentage of the billings from such work. If so, the amounts of the so-called "commission", or kickbacks, thus received by Dwyer are includable in his gross income. FINDINGS OF FACT
The parties have filed a stipulation of facts which, together with accompanying exhibits, is incorporated herein by this reference. Petitioners are husband and wife. They filed joint Federal income tax returns for each of the calendar years 1963 through 1966 with the district director of internal revenue at Los Angeles, California, and resided in that city when they filed their petition herein. William E. Dwyer ("petitioner") was an insurance claims adjuster. He was active in that business *226 for a period of more than 30 years, ending with his retirement in September of 1971. During the years 1963 through 1966, he operated within the greater Los Angeles area through a proprietorship known as "Cal-Coast Adjusters". Petitioner's function as an adjuster was to represent and protect the interests of insurance companies in the administration of claims arising out of losses the companies had insured. In general, he was responsible for conducting investigations of reported claims, obtaining estimates from contractors 3 of the costs of repairing damaged properties, and verifying the reasonableness of those estimates. Petitioner was retained by insurers on either a regular or piecework basis; he was not a "public" adjuster whose job it was to represent claimants. Sometime prior to 1963, petitioner developed a close professional relationship with the Abbey Construction Company ("Abbey"), a contracting firm that specialized in restoring and renovating insured properties. That relationship, described more fully hereinafter, lasted until sometime in 1967. At the time petitioner started doing business with Abbey, the firm was a partnership owned by Marvin Hoffman and Mel *227 Bicknell. Bicknell withdrew from the business in 1963, and Hoffman continued to operate Abbey as a proprietorship through the year 1966. Petitioner and Abbey entered into an arrangement whereby petitioner would exercise his influence as a claims adjuster to enable Abbey to compete in the bidding on certain casualty repair work which insurance companies assigned petitioner to administer. Abbey was paid for the work it thus secured out of insurance awards, and in consideration of petitioner's efforts on its behalf it paid him a "commission" on each job, measured by a percentage (usually five percent but sometimes a greater percentage) of its billings on such work. Kickback 4 arrangements of this sort were the principal means by which Abbey obtained work during the years 1963 through 1966; the firm's use of conventional modes of advertising was gradually curtailed during this period. The Commissioner determined that petitioner thus received unreported income from Abbey during each of the years in issue in the following amounts: 1963
$10,732.50
1964
22,203.00
1965
3,721.00
1966
709.00
Petitioner procured work for Abbey on a fairly regular basis throughout *228 the four years here in issue, but he directed significantly less business to the firm toward the end of that period, as the figures above indicate. He called upon Hoffman for "commission" payments at irregular intervals ranging from a few days to several weeks, and the amounts of the individual payments varied between a few dollars and several thousand dollars. At petitioner's insistence, such payments were always made in cash, which Hoffman ordinarily obtained from Abbey's bank account. Upon receiving a request for payment from petitioner, Hoffman would typically go to the bank and cash a check either in the precise amount of the payment due or in a larger amount.Any such excesses were placed in a metal box kept at Abbey. At times the accumulations in the box were sufficient to cover a payment due to petitioner, so it was not necessary for Hoffman to visit the bank and cash a check each time petitioner approached him for "commissions". 5 There were also times, on the other hand, when even the funds available from the box and the Abbey bank account together could not cover a required payment. In these instances Hoffman paid petitioner out of his own personal resources, but *229 he nonetheless wrote a check on the Abbey bank account for the amount of each such payment at the time it was made. When Abbey's checking account had been replenished by business revenues - which on a few occasions did not occur until months after these checks had been drawn, particularly during the last months of 1966 - , Hoffman cashed the checks and retained the proceeds, thereby securing reimbursement from Abbey. When the sums for a payment requested by petitioner had been obtained, either Hoffman, his wife Lucille, who worked part-time at Abbey, or a clerk would place the required amount of currency (the odd change owing to petitioner was rounded to the nearest dollar) in a plain business envelope. Petitioner usually came to Abbey to collect his "commissions" within a short time after getting in touch with Hoffman; he rarely waited more than one day. Hoffman or Lucille sometimes handed petitioner the envelopes containing cash in the privacy of Hoffman's office, while at other times these transfers were made in plain view of anyone who happened to be present at Abbey. On a few occasions Hoffman made envelope deliveries at petitioner's place of business or at other places *230 where the parties met. 6 A substantial portion of the contracting work received by Abbey through the exercise of petitioner's influence was related to insurance claims petitioner was handling for the Phoenix Insurance Company ("Phoenix"). Petitioner performed a considerable amount of adjustment work for Phoenix during the years 1963 through 1966, particularly on claims involving fire losses in the Los Angeles area. The Phoenix executive then responsible for appointing adjusters was one Irving Hamma, who was assigned to the company's San Francisco office. In most instances petitioner was approached through a subordinate of Hamma's named Winifred Joyce Lord, who worked out of Phoenix's branch office in Los Angeles. Petitioner had establ1shed a relationship with Hamma similar to that involving himself and Abbey, namely, a kickback arrangement whereby petitioner paid for Hamma's favors in assigning him adjustment work. Sometime around May of 1964, when petitioner was directing to Abbey much of the contracting work on his Phoenix assignments, petitioner persuaded Hoffman that Abbey should assume responsibility for making most of the payments to Hamma. Abbey thereupon began *231 sending $100 to Hamma each month - a flat payment unrelated to the volume of business that either Abbey or petitioner obtained through Hamma. In some months, however, Abbey could not meet the full amounts of these payments, and petitioner occasionally made up 7 all or part of such deficiences. All of these transactions were separate from, and supplementary to, Abbey's "commission" payments to petitioner. Pursuant to petitioner's instructions, Abbey sent the monthly payments directly to Hamma, and, like the kickbacks to petitioner, such payments were always made in cash. The cash was transmitted by registered mail to a San Francisco address where Hoffman understood it would be received by Hamma. That destination, however, was neither Hamma's office at Phoenix nor his personal residence. Copies of the postal receipts from these mailings were sent to petitioner's business office, pursuant to Hoffman's directions to the Post Office. Abbey paid "commissions" to others in addition to petitioner and Hamma, and payments to all of these persons were reflected in a ledger (payments to Hamma being denoted by the legend "S.F. Acct.") wherein Abbey recorded transactions involving *232 the metal box mentioned above. Deposits consisting of the proceeds from the Abbey checks periodically cashed by Hoffman were also shown on these pages. In at least some instances where Hoffman cashed a check in the precise amount of a payment that was to be made, the transaction was treated on the ledger as a simultaneous deposit to, and withdrawal from, the metal box, but the record does not show whether this procedure was consistently followed. 8 Abbey also maintained a separate journal to account for individual contracting jobs that it secured through the efforts of adjusters or other persons, and in respect of which it thus paid "commissions". The dates, amounts, and respective recipients of such payments - including those to petitioner and Hamma (Hamma again being identified by the caption "S.F. Acct.", and petitioner at times by the initial "D") - shown in that journal correspond to entries made in the aforementioned "metal box" ledger. Nothing appearing on the income statements for Cal-Coast Adjusters that accompanied the Dwyers' joint tax returns for 1963 through 1966, or any other information contained in those returns, indicates that petitioner received kickbacks *233 from Abbey. The Commissioner thus determined that petitioner "received other income which was not reported on your income tax return". The amounts of such unreported income are indicated above. 9 OPINION
RAUM, Judge: Petitioner does not challenge the Commissioner's computation of the amounts of the so-called "commissions" he received from Abbey. Nor has he argued that such amounts were in fact reported on his tax returns but not separately identified therein. And he does not contend that he merely passed the payments on to insurance company employees with whom he was connected, namely, Hamma or Joyce Lord. He insists rather that he received no "commissions" of any kind from Abbey. As our findings indicate, we think that his position is inconsistent with the weight of the evidence. At the trial herein we heard two entirely different versions of the nature of the relationship between petitioner, Hoffman, and Hamma. It would serve no useful purpose to outline in detail the elements of our decision to accept the substance of Hoffman's portrayal, which appears in our findings. To be sure, the Commissioner had disallowed income tax deductions the Hoffmans had claimed for *234 the amounts of certain alleged "commission" payments, including those made to petitioner, and the resulting deficiencies were settled only after the trial herein had been concluded. The Hoffmans' testimony, like the Dwyers", was thus self-serving in nature. But credibility was lent to their story by the testimony of witnesses whom we found to be believable, even though they were not 10 uniformly neutral in the dispute between the Hoffmans and the Dwyers.The Hoffmans also introduced as evidence certain business records and other documents, some of which are mentioned in our findings, further to substantiate their claims. Certain superficial irregularities in those materials were satisfactorily explained by Hoffman, and the substantiating testimony of credible witnesses satisfies us as to their authenticity. Petitioner did not deny that he had regular business contacts with Abbey or that that firm performed contracting work on many insurance jobs on which he acted as claims adjuster, but he maintained that he played no part in directing any of that business to Abbey. Not only was petitioner's account of his relationship with Abbey at odds with other convincing evidence, but *235 our confidence in his veracity was further shaken by his steadfast insistence that no recommendation he might have made to an assured party could have affected that party's choice of a contractor. Moreover, petitioner not only denied his own receipt of any kickbacks from Abbey, but he also disavowed any knowledge of similar payments flowing from Abbey to Hamma. Yet he admitted to receiving copies of the postal receipts for the monthly transmittals Hoffman sent to Hamma by registered mail. If Hoffman and Hamma meant 11 to conceal from petitioner the contents and purpose of those letters, as he implied, we think it unlikely that Hoffman would have had copies of the postal receipts sent to petitioner's place of business. The testimony of other witnesses called upon by petitioner, or otherwise tending to support his position, we found either to be unreliable by reason of manifest self-interest on the part of the witness (e.g., the record strongly indicates that Joyce Lord, as well as petitioner and Hamma, received occasional kickbacks from Abbey, either independently or through petitioner) or not inconsistent with the evidence in Hoffman's favor. And the fragmentary account of *236 Hoffman's business practices rendered by his brother Kenneth was of dubious probative value in view not only of the witness' lack of proven familiarity with Abbey's methods of operation but also the suggestion of a degree of animosity between the brothers appearing on Kenneth's cross-examination. We hold that petitioners have failed to carry their burden of proof by credible evidence, and hereby find that petitioner William E. Dwyer in fact received the amounts of commissions or kickbacks determined by the Commissioner for each of the years in issue. Decision will be entered for the respondent.